# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

_____

Nº 11-CV-3543 (JFB) (ARL)

_____

GROUT SHIELD DISTRIBUTORS, LLC,

Plaintiff,

VERSUS

ELIO E. SALVO, INC. D/B/A MIRACLE SEALANTS COMPANY,

Defendant.

_____

**MEMORANDUM AND ORDER**
November 16, 2011
_____

JOSEPH F. BIANCO, District Judge:

Plaintiff Grout Shield Distributors LLC ("Grout Shield Distributors" or "plaintiff") brought the instant action against defendant Elio E. Salvo, Inc., doing business as Miracle Sealants Company ("Miracle Sealants" or "defendant"), under the Lanham Act for trademark infringement, false designation of origin, and trade dress infringement, as well as under New York law, regarding defendant's use of an unregistered trademark, described in detail *infra*, in connection with its grout protection products. Grout Shield Distributors seeks a preliminary injunction that would enjoin Miracle Sealants from using the trademark in connection with its grout stain protection product line until a final determination is made on the merits of plaintiff's claims.

The Court held an evidentiary hearing on the motion for a preliminary injunction on September 9, 2011, which was continued to September 12, 2011, and after which the parties submitted written letters to supplement briefs submitted prior to the hearing. At the preliminary injunction hearing, the parties had the opportunity to examine witnesses and present documentary evidence.

Having carefully reviewed the evidence and assessed the credibility of the witnesses, the Court makes the following Findings of Fact and Conclusions of Law, pursuant to Rules 52(a) and 65 of the Federal Rules of Procedure, and denies the motion for a preliminary injunction for the reasons set forth in this Memorandum and Order. Specifically, the Court concludes that plaintiff has failed to demonstrate

irreparable harm because of (1) plaintiff's acknowledgement that, as of the date of the hearing, defendant's product had not affected plaintiff's sales; and (2) the unreasonable delay by plaintiff in bringing the preliminary injunction motion -- namely, over 18 months after plaintiff became aware of defendant's product, and approximately 5 months after settlement discussions broke down.  In the alternative, even assuming *arguendo* that plaintiff had demonstrated irreparable harm, plaintiff has failed to demonstrate a likelihood of success on the merits.  As a threshold matter, given that plaintiff never registered the "Grout Shield" mark, it cannot rely on any presumption of validity that a registration would provide.  Moreover, plaintiff has failed to demonstrate likelihood of success on the merits because (1) plaintiff has failed to put forth sufficient evidence that the descriptive mark has acquired secondary meaning, such that it is protectable; and (2) even if plaintiff has established secondary meaning, plaintiff has failed to demonstrate a likelihood of consumer confusion.  Finally, even if plaintiff demonstrated sufficiently serious questions going to the merits to make them a fair ground for litigation, plaintiff has failed to demonstrate a balance of hardships tipping decidedly in plaintiff's favor.

## I. BACKGROUND

Before proceeding to delineate the Court's Findings of Fact for purposes of Rule 52(a), the Court begins by providing a summary of the instant matter and the foundation of the factual dispute between the Parties.

### A.  The Mark

The controversy in the instant case centers on a dispute over the rightful owner of the Grout Shield word mark (hereinafter "Grout Shield mark").  (Compl. ¶¶ 14-15, 47.)  The Grout Shield word mark consists of the words "Grout Shield."[1]  Plaintiff does not claim rights to a particular font, style, size or color of the text.  It is undisputed that plaintiff has not registered the Grout Shield mark.

### B.  Plaintiff's Allegations

Plaintiff claims that it has been using some variation on the Grout Shield mark since 2006, displayed prominently on its products related to coloring, cleaning, and sealing grout.  (*Id.* ¶¶ 11, 14, 17, 20.)  Plaintiff further claims that it owns the rights to use GROUTSHIELD.com and GROUTSHIELDS.com domain names.  (*Id.* ¶ 16.)  Grout Shield Distributors sells its products over the internet throughout the United States, in retail stores on Long Island, and has established distributorships in a number of states.  (*Id.* ¶ 19.)

Plaintiff seeks a preliminary injunction to bar defendant from using the Grout Shield mark.[2]  (Pl.'s Mot. at 3.)  Plaintiff contends

---

[1] Plaintiff is also claiming rights to other variations on the Grout Shield mark, including "Grout Shields."  However, defendant is specifically using the Grout Shield mark as defined above and, thus, the dispute centers specifically on that version of the Grout Shield mark.

[2] Although plaintiff also claims trade dress infringement, among other claims, it is not seeking a preliminary injunction to prevent defendant's use of its trade dress, which is the shield and banner on which the Grout Shield mark appears, separate and apart from defendant's use of the Grout Shield mark.  (Pl.'s Mot. at 3.)  Instead, plaintiff's motion focuses on defendant's use of the Grout Shield mark itself.  Plaintiff relies on defendant's trade dress to make the argument that, in combination with the Grout Shield mark, it creates a likelihood of confusion over the source of the parties' products.  *See infra.*  In any event, to the extent plaintiff may be seeking a preliminary injunction

that defendant's product is confusingly similar to its own and that its business will be harmed if defendant continues to sell its products using the Grout Shield mark.

## II. FINDINGS OF FACT

After reviewing the testimony and documentary evidence, the Court makes the findings of fact discussed below.

### A. Grout Shield Distributors— Development and Use of Grout Shield Mark

In November 2006, Michael Stracuzza ("Stracuzza"), plaintiff's president and owner, started Grout Shield Distributors to sell the grout products central to this dispute. (Preliminary Injunction Hearing, dated September 9, 2011 (hereinafter "Tr. Sept. 9") at 51:15-18, 52:1-23.) The products include a grout cleaner, a grout enhancer, and a color seal. (*Id.* at 52:15-16; Def.'s Ex.[3] A-C.) Plaintiff has been using the Grout Shield mark as well as "Grout Shields" on its products since 2006. (Preliminary Injunction Hearing, dated September 12, 2011 (hereinafter "Tr. Sept. 12") at 34:11-18.)

In addition, plaintiff has been using other word marks and logos on its products. For example, plaintiff has used the word mark "GroutShield" to promote its products. (Def.'s Ex. I (on a YouTube video uploaded on June 13, 2007)); Def.'s Ex. J (on a YouTube video uploaded on December 25, 2006).) Plaintiff has also used a logo with a gladiator beside the words "Grout Shields"

and "Grout Restoration System." (Pl.'s Ex. 10 at 1, 7; Tr. Sept. 9 at 112:9-12.) Within the past year, plaintiff started using the Grout Shield mark on a background of a red shield with a banner running between the words "Grout" and "Shield" (hereinafter the "red shield logo").[4] (Tr. Sept. 12 at 59:7-20; *see also* Def.'s Ex. A-C, Def.'s Ex. F-G.)

---

[4] Plaintiff does not indicate a specific date when the red shield logo came into use. However, based on the documentary evidence submitted by the parties at the preliminary injunction hearing, as well as from witness testimony, the Court concludes that the logo came into use by plaintiff within a year prior to the preliminary injunction hearing. Stracuzza testified that his use of the red shield logo was "minimal" prior to "[n]ow, going into retail." (Tr. Sept. 12 at 59:7-60:4.) Plaintiff went into retail "within the past year." (Tr. Sept. 9 at 100:2-9.) Thus, the Court concludes that plaintiff was not using the red shield logo consistently prior to September 2010. This conclusion is supported by other evidence in the record. The red shield logo did not appear on plaintiff's website until July 2011 based on snapshots of plaintiff's website submitted by defendant. (*Id.* at 120:14-24, 122:3-25; 123:1-6.) The Court credits Stracuzza's testimony that the red shield logo came into use some months prior to July 2011, but the snapshots support the finding that the logo's use was minimal, at best, prior to September 2010. Stracuzza testified that the red shield logo appears in three or four out of nine to eleven YouTube videos that plaintiff has uploaded, but did not indicate the dates those videos were created or added to YouTube. (Tr. Sept. 12 at 63:10-18.) Thus, the YouTube videos do not affect the Court's analysis. The Court also notes that Stracuzza's testimony solicited by defendant that the red shield logo was not used by plaintiff in its YouTube video from September 22, 2009 is not relevant to this issue. (Tr. Sept. 12 at 14:21-23, 15:2-17, 16:9-13.) That video concerned another of Stracuzza's companies, Grout Line Solutions, LLC, and was not admitted into evidence. (*Id.* at 15:11-12, 16:11-13.)

---

based on defendant's use of its trade dress, the Court concludes that argument is without merit for the reasons discussed *infra*.

[3] Unless otherwise noted, all exhibits referenced herein are from the preliminary injunction hearing.

The word "GROUT" appears at the top of the red shield and the word "SHIELD" is at the bottom; a banner with the words "Grout Restoration System" in uppercase letters runs across the red shield in-between "GROUT" and "SHIELD." (*See, e.g.*, Def.'s Ex. A-C; Tr. Sept. 9 at 108:24-109:9.)

All three of plaintiff's products are advertised on their labels as protecting grout from mold, mildew and stains. (Def.'s Ex. A-C.) The color seal is advertised as restoring the color of grout. (*Id.* Ex. A.) It is a "finish top coat" that is applied onto the grout line. (*Id.*) The tile and grout deep cleaner "lifts dirt from the grout" and, like the color seal, requires topical application onto set grout. (*Id.* Ex. B.) The enhancer product is advertised for hard surface floors and is formulated to enhance their natural color.[5] (*Id.* Ex. C.) Like the other products, the enhancer is intended for topical application. (*Id.*) None of plaintiff's products are promoted as additives to grout and are generally not intended for use as additives. (Tr. Sept. 9 at 22:8-10, 40:4-7, 93:18-24, 117:17-18.) They can be used as an additive but over small square footage in order to, for example, fix cracked grout as is demonstrated on plaintiff's website and YouTube videos. (*Id.* at 40:3-7, 45:6-9; 93:18-24, 117:13-24.)

Around November 2006, plaintiff acquired the domain name GroutShields.com. (*Id.* at 53:14-16.) Plaintiff acquired the domain name GroutShield.com in 2008 because it was previously unavailable for plaintiff's use. (*Id.* 53:17-22.)

Plaintiff's product is sold directly to consumers on the internet and, thus, ninety percent of all sales are done online. (*Id.* at 100:2-9.) Plaintiff also sells to distributors, but only two in the Untied States are allowed to use plaintiff's mark and logo; the rest bottle the products and resell them under their company name. (Tr. Sept. 12 at 24:12-14; 25:19-20, 27:6-9.) Plaintiff started selling his products in retail stores in the "New York area" within the past year. (Tr. Sept. 9 at 100:2-9.)

Plaintiff's president and owner, Stracuzza, conceded that the sales of plaintiff's products have not been affected by defendant's grout additive. (*Id.* at 70:16-18.)

### B. Miracle Sealants—Use and Development of Grout Shield Mark

Miracle Sealants has over forty products, one of which is a grout additive that is at issue in this litigation (hereinafter "grout additive" or "defendant's product"). (Tr. Sept. 12 at 74:8-10; Def.'s Ex. Y (sample bottle).) The grout additive is defendant's only product using the Grout Shield mark. (*See, e.g.,* Pl.'s Ex. 16 (displaying defendant's products).) The grout additive is intended to be mixed in with the grout before it is applied; it is intended to strengthen the grout and help maintain it from staining by sealing in the grout's color.[6] (Tr. Sept. 12 at 149:19-150:11.) Defendant's product performs the same function as plaintiff's products in protecting grout. (*Id.* at 150:24; 151:1-4.) The grout additive is marketed and sold in a silver-grey bottle that contains a "graphic representation of a shield" in the upper-left

---

[5] Plaintiff conceded that the enhancer is "similar to one of [defendant's] other products," not the grout additive that Miracle Sealants sells. (Tr. Sept. 9 at 108:6-9.) Thus, plaintiff is not claiming that there is any confusion between defendant's product and its enhancer product.

[6] Defendant also sells a color seal for grout, but that product is not at issue in this dispute because it is labeled "Miracle Sealants Color Seal." (Tr. Sept. 9 at 94:15-22.)

corner of the label (hereinafter "defendant's trade dress"). (*Id*. at 75:10-15.) The words "Grout Shield" appear in large, uppercase letters on the drawing of the shield; a banner, which is drawn over the bottom of the shield, contains the words "Miracle Sealants Company" and three peaks. (*Id*. at 75:13-15; Def.'s Ex. Y.)

Albert P. Salvo ("Salvo"), the Co-Owner and Co-President of Miracle Sealants, named defendant's product "Grout Shield" in September 2009.[7] (Tr. Sept. 12 at 78:12-16, 82:24-83:2.) It was intended to compete with a product called "Grout Boost." (*Id*. at 76:6-14.) The Court finds credible Salvo's testimony that he chose to name the product "Grout Shield" because, in his mind, it described best what the product was intended to do, namely, to "create[] a shield to protect the grout from staining." (*Id*. at 76:6-14, 96:6-8; *see also id*. at 79:7-11, 96:4-8, 138:5-16.) Defendant asked its attorney to perform a trademark search to see if it could use the Grout Shield mark. (*Id*. 79:1-19.)

---

[7]  The Court finds credible Salvo's testimony that he did not meet Stracuzza or receive a card for Grout Shield Distributors at a trade show in Orlando, Florida held in 2008. (Tr. Sept. 12 at 111:6-22.)  Furthermore, the Court finds credible Salvo's testimony that there was no record of any card for Grout Shield Distributors being handed to any of defendant's employees at that trade show, nor at a similar trade show held in 2009, and none of defendant's employees remembered speaking with plaintiff. (*Id*. at 142:4-24, 143:1-12; Stracuzza Depo. at 66:17-67:14 (stating he gave a card, with plaintiff's logo, to one of defendant's employees at the 2009 show without explaining which of plaintiff's variations on the Grout Shield mark was used on the card).)  In sum, there is no credible evidence on record that defendant became aware of plaintiff, or plaintiff's products, at the 2008 and 2009 trade shows.

Although defendant talked about the product as "Miracle Grout Shield," it has also been referred to as "Grout Shield," which was used in the product videos on defendant's website. (Tr. Sept. 12 at 94-96.) A PDF of defendant's safety datasheet lists the product name as "Grout Shield." (Pl.'s Ex. 8.) Consumers referred to defendant's product as "Miracle Grout Shield" or "Miracle Sealant company's Grout Shield." (Pl.'s Ex. 9 at 4, 7.) Defendant registered the domain name MiracleGroutShield.com for its grout additive. (Tr. Sept. 12 at 93:13-16.) It is unclear whether defendant ever tried to register GroutShield.com as a domain name. (*Id*. at 94:1-7.)

On December 7, 2009, defendant filed an application to the United States Patent and Trademark Office to register the trademark "Grout Shield Miracle Sealants Company" and logo with the United States Patent and Trademark Office ("USPTO"). (Compl. Ex. F at ¶ 3; Pl.'s Supplemental Letter, dated Sept. 26, 2011 ("Pl.'s Letter") Ex. B at 1.) The USPTO requested that defendant disclaim the words "grout" and "sealant" apart from in combination with the other words in the requested word trademark.  (Tr. Sept. 12 at 92:17-25.) Defendant was not requested to disclaim the word "shield." (*Id*.)

Defendant's product was first shipped to distributors in December 2010 and it became available to the public in January 2011. (*Id*. at 96:17-20.) Defendant's product is sold through approximately twenty-six commercial distributors, as well as Home Depot. (*Id*. at 102:13-21, 130:14-15.) Overall, 95 percent of the product is sold in stores. (*Id*. at 102:8-10.) Although defendant does not sell the product via the internet, third parties do, including Home Depot. (*Id*. at 106:10-14; 107:16-25; Def.'s Ex. W.) Defendant solely supplies Home Depot stores on the West Coast and in the

Mid-West.  (Tr. Sept. 12 at 129:22-130:6.) Defendant's product is also sold in a retail store in New Jersey.  (*Id.* at 130:10-15.)

C.  Communications from Customers

On March 3, 2011 plaintiff received an email from customer Terry Turzynski stating that he found plaintiff's product at Home Depot and inquiring about its reliability.  (Pl.'s Ex. 12; Tr. Sept. 9 at 84:22-85:11.)  Turzynski was confused about the source of defendant's product.

In May 2011, Bryce Klym ("Klym"), who works at Home Depot, purchased Miracle Sealant's grout additive and used it on grout in his basement.  (Pl.'s Ex. 2 at 1-2.)  After applying this product, a white haze developed over Klym's floor.  (*Id.* at 1.) Klym proceeded to look up the product on the internet in order to solve this problem and contacted plaintiff believing that the grout additive was one of plaintiff's products.  (*Id.*)  As plaintiff's president and owner, Stracuzza was told about Bryce's phone call.  (Tr. Sept. 9 at 42:14-20.)

On July 4, 2011, plaintiff received an email from George Games ("Games"), a contractor and "long time customer" of plaintiff's grout products.  (Pl.'s Ex. 13.) Games indicated that he had been "confused as a customer" that plaintiff's "company name Grout Shield has been on another product that is not your company. It seems that Grout Shield Miracle Sealant has stolen the good name of your long standing product name . . . ."  (*Id.*)  Games stated that he was prompted to write the letter because he saw a product in plaintiff's name at his local Home Depot in Woodland Hills, California, which he "almost bought" believing it was plaintiff's name on the bottle.  (*Id.*)  Games later saw that the label for defendant's product stated "Miracle Sealants Company."  (*Id.*)  Games had

initially contacted plaintiff over the phone because, after seeing Miracle Sealant's product at Home Depot, he wanted to become one of its distributors, but learned that it was not plaintiff's product.  (Tr. Sept. 9 at 85:23-25, 86:1-15.)

Several individuals contacted plaintiff via internet chat on plaintiff's website in June and August of 2011 with questions about defendant's product, believing that it was actually plaintiff's product.  (Pl.'s Ex. 3-4; Tr. Sept. 9 at 26-27, 28-29.)

Plaintiff received an undated phone call from Frank McKenna who contacted plaintiff after watching one of its YouTube videos.  (Tr. Sept. 9 at 87:3-24.)  During that conversation, he inquired about "the company Miracle Grout Shield" because on YouTube he saw a link to defendant's videos.[8]  (*Id.* at 87:13-24.)

_____

[8]  At the preliminary injunction hearing, plaintiff also relied on a letter from Fran Thompson ("Thompson") as indicating confusion of plaintiff's and defendant's products.  (Tr. Sept. 9 at 82-83.)  After carefully reviewing the testimony regarding Thompson's letter, as well as the letter itself, the Court concludes that Thompson was not, in fact, confusing the products.  She specifically stated in her letter, dated July 9, 2011, that she "spent many hours re-researching the difference between websites for 'Grout Shield' and Miracle 'Grout Shield.' . . . I couldn't find any connection between 'Grout Shield' and Miracle 'Grout Shield.'"  (Pl.'s Ex. 11.)  Though she states that it is "very confusing to consumers" that both companies are using "Grout Shield" on their products (*id.*), it is apparent from her letter that she was aware that there were two different companies involved selling different products.  Thompson was interested in purchasing Miracle Sealant's product because it was available at Home Depot, but decided that it was not the best fit for her needs because it had to be added to grout.  (*Id.*) After learning that the Home Depot product was

2. Internet Searches

i. Organic Search

An organic search will rank results based how many websites reference the search terms. (Tr. Sept. 9 at 63:2-8.) Such a search involves simply plugging in search terms in the search bar, with results appearing on the left side of the page. (*See, e.g.*, Pl.'s Ex. 6.) Thus, the more websites sell a product, the higher that product's ranking on the search engine will be. (Tr. Sept. 9 at 63:2-8.)

An undated search on Google using the terms "grout shield," without quotation marks, resulted in approximately 818,000 results. (Pl.'s Ex. 6 at 1.) On the first page of results for the organic search hits, plaintiff's product appears four times and defendant's product five times. Underneath the pay-per-click results, discussed in more detail *infra*, are shopping results for "grout shield" displaying defendant's product twice, in different bottle sizes, and, below, plaintiff's grout restoration kit. (*Id.*) Defendant's website is ranked below the shopping results. (*Id.*) Next on the list, in descending ranking order, are: (1) plaintiff's YouTube video; (2) an unidentified YouTube video; (3) a website advertising plaintiff's product; (4) a website advertising defendant's product; (5) a PDF document from Home Depot describing defendant's product; and (6) a website

advertising plaintiff's product. (*Id.* at 2; Tr. Sept. 9 at 64:23-25, 65:1-3.)

An identical, undated, search for "grout shield" on the Bing search engine led to over two million results. (Pl.'s Ex. 6 at 4; Tr. Sept. 9 at 65:5-25, 66:1-2.) Overall, in the organic search results, plaintiff's website and products ranked higher than defendant's; defendant's website or products appear four times compared to eight times for plaintiff. Plaintiff's website appears fourth and fifth in the rankings, in descending order. (*Id.* at 65:8-10.) Next are the "Shop for grout shield" results, which display, from left to right, defendant's product, plaintiff's product, and defendant's product twice more. (*Id.* at 65:10-17; Pl.'s Ex. 6 at 4.) The remaining hits on the first page are, in descending order: (1) defendant's website; (2) three websites advertising plaintiff's product; (3) plaintiff's YouTube video; (4) an unidentified Canadian website; (5) plaintiff's website; and (6) an unidentified website. (*Id.* at 4-5.)

Finally, an identical, undated search performed on the Dogpile search engine resulted in nine organic web results. (*Id.* at 10-11.) Plaintiff ranked highest and also appeared second on the list. (*Id.* at 10.) Defendant's website appeared only once on the list in the third hit. (*Id.*) Plaintiff's product or website appeared in all but one of the remaining hits. (*Id.*)

ii. Pay-per-click Search

Advertisers pay search engines "per click," or based on the number of times a consumer clicks on the company's advertisement to link to its website.[9]

---

not suitable for her intended use, she contacted plaintiff to purchase its product.

The Court also finds the email from Stephen McDermott to plaintiff irrelevant to the issue of confusion because it addresses advertising of defendant's product in Australia. (Pl.'s Ex. 15; Tr. Sept. 9 at 90-91.)

However, even if these instances were considered to be instances of confusion, the evidence is still insufficient for the reasons discussed *infra*.

---

[9] The "pay-per-click" system on Google is defined in *Rescuecom Corp. v. Google, Inc.*, 562 F.3d 123, 125 (2d Cir. 2009).

On Google, the pay-per-click advertisements appear on the right side of the search results page, as well as in the banner at the top of the search results page. (Tr. Sept. 9 at 62:16-19.)  A Google search for "grout shield," as described above, yielded pay-per-click results, listed below in descending order.   Plaintiff's website appears three times in the banner; it also appears first on the right side of the results page under "Ads."  (Pl.'s Ex. 6 at 1; Tr. Sept. 9 at 63:19-25.)  It is unclear whether defendant's product appears in the pay-per-click results.

In the pay-per-click search results for Dogpile, plaintiff's products come up first and second, while defendant's product comes up as fourth, fifth, and seventh, moving from left to right.  (Pl.'s Ex. 6 at 11-12; Tr. Sept. 9 at 66:17-25, 67:1-2.)

Plaintiff appears once in the pay-per-click results on Bing; defendant does not appear at all.  (*Id*. at 65:20-21; Pl.'s Ex. 6 at 4.)

### iii. Keywords

Depending on the keywords associated with a given website, the rankings of that website in search results, both organic and pay-per-click, can be affected.  (Tr. Sept. 12 at 56:25-57:1.)

Defendant hired a company named Dynacor to develop their website for the grout additive and to also create search words to bring people to that website.  (Tr. Sept. 12 at 109:14-20, 110:1-12.)  The keywords that, when used in a web search, will bring up the website for the grout additive are: "grout sealant, grout sealer, grout, sealant, sealer, cleaner, additive, grout shield, groutshiel [sic]."  (Pl.'s Ex. 7 at 2.)

The keywords used by plaintiff for groutshields.com are:  "clean your grout, seal your grout, grout colorant, seal, sealer, match, change, color, colorant."  (*Id*. at 1; Tr. Sept. 9 at 68:17-25, 69:1-7.)  It appears that plaintiff's keywords list is cut off.  (*See* Pl.'s Ex. 7 at 2.)

### 3. Use of "Grout Shield" by Other Companies

A Google search for "Grout Shield" in quotation marks yields hits for products other than those of plaintiff and defendant that use "Grout Shield" in the product name. (Tr. Sept. 12 at 53:15-18, 57:23; Def.'s Ex. X; Def.'s Letter in Support, dated Sept. 26, 2011 ("Def.'s Letter") Ex. C ¶ 4 (Decl. of Corby Cochran Anderson dated Sept. 26, 2011).)   Some of those products have entirely different uses and are not competing with either plaintiff's or defendant's products.  For example, Sandell's produces a Grout Shield that "guards against grout and mortar seepage through block cores." (Def.'s Ex. X at 4; Tr. Sept. 12 at 67:1-12.)

Some products using "Grout Shield" in their name do perform similar functions as plaintiff's products, but there have been no reported instances of confusion of plaintiff's products with these "Grout Shield" products.[10]   (*Id*. at 61:5-20, 67:13-68:1,

---

[10]   In a declaration dated September 26, 2011, Salvo explains discovering another "Grout Shield" product with a shield logo.  (Docket No. 31-4.)  That product displays prominently, at top-center on its label, the words "Polystone Grout" followed by the word "Premixed."  (*Id*. Ex. A.)  Below those words is a shield with inserted text: "GROUT" followed by "SHIELD" written underneath.   (*Id*.)   The product is advertised as repelling "most household stains." (*Id*.)  The product appears to perform a similar function to that of plaintiff's products, but it is unclear whether any instances of confusion with plaintiff's products have been reported.

70:1-4; Def.'s Ex. X at 5 (Gundlach Grout Shield), 9 (Pro-Link Grout Shield); Def.'s Ex. R (explaining that Gundlach Grout Shield "is a solvent bared grout sealer that can be applied to damp uncured grout immediately following installation"); Def.'s Ex. S-T (Easy Care Grout Shield).) Defendant is not aware of any other companies using the Grout Shield mark "first as their primary trademark in the beginning of the trademark." (Tr. Sept. 12 at 151:5-8.)

### D.   Quality of Defendant's Product

Defendant has set forth evidence, which the Court finds credible, that it has sold more than 50,000 gallons of its grout shield product, with its 20-year warranty, and has received no complaints on its product from Home Depot, which accounts for 95 percent of its sales. (A. Salvo Decl. ¶ 26.) With respect to complaints to the defendant directly from customers, defendant was aware of approximately five complaints about its grout additive. (Tr. Sept. 12 at 112:15-21, 116:23-25.)

Plaintiff proffered evidence from three customers who contacted plaintiff after purchasing and using defendant's product because of a haze that developed over their grout. *See supra*. However, the Court found to be credible the testimony from Albert Salvo, in light of the lack of widespread complaints, that such complaints are problems with the application of the product, rather than the quality of the product itself.

### E.   Advertising & Sales

In 2009, plaintiff spent $22,696.77 in advertising. (Tr. Sept. 9 at 59:18-22; Pl.'s Ex. 5 at 4.) That number rose to $86,106.30 in 2010. (Tr. Sept. 9 at 60:1-2; Pl.'s Ex. 5 at 3.) As of June 23, 2011, plaintiff spent

$40,860.59 on advertising, excluding Google advertising. (Tr. Sept. 9 at 60:3-13; Pl.'s Ex. 5 at 1.) These advertising costs include internet advertising, unless otherwise stated, as well as hiring a public relations firm, a social media company and others to assist plaintiff in promoting its products. (Tr. Sept. 9 at 60:7-25.)

Plaintiff hired an individual as its public relations representative who is in touch with media outlets and reporters on plaintiff's behalf. (*Id*. at 78; Stracuzza Depo. 43:6-9.) According to plaintiff, reporters will have "10, 15 people" to choose from and "then these reporters pick; a lot of them pick [plaintiff] because they see the growth of [the] company over the past five years." (Tr. Sept. 9 at 78:7-15.) Five articles about plaintiff have appeared in the Long Island Business News, Newsday, the Home Shopping Network ("HSN"), and the New York Real Estate Journal. (*Id*. at 77:9-78:7; Pl.'s Ex. 10.) However, only three out of the five articles actually discussed plaintiff's products. (Pl.'s Ex. 10 at 1-2, 6-7.) Of these three articles, the first was published in the May 29-June 4, 2009 edition of the Long Island Business News, the second was published by HSN on September 6, 2011, and the most recent was published in the June 28-July 11, 2011 edition of the New York Real Estate Journal. (*Id*.) Plaintiff has advertised in the Extreme How-To magazine, but it is unclear when and how often. (Stracuzza Depo. 41, 43:15-17.) Plaintiff has given a showing at HSN and is scheduled to do three more at HSN's request; plaintiff has also filmed on the Do-It-Yourself Network, though it is unclear if plaintiff was solicited or if he reached out to the network. (Tr. Sept. 9 at 61:3-22.)

The sales of plaintiff's products have been increasing over the years.[11] In 2007,

---

[11]   The sales figures for 2008 do not include

plaintiff's sales records indicate that its product sales totaled $29,480. (Tr. Sept. 9 at 20:14-18; Pl.'s Ex. 1.) Subsequent figures were as follows: for 2008, approximately $122,000 (Tr. Sept. 9 at 57:25-58:3; Tr. Sept. 12 at 58:2-8; Pl.'s Ex. 1); for 2009, $136,348.15 (Tr. Sept. 9 at 20:20; Pl.'s Ex. 1); for 2010, $245,131.30 (*Id*.; Tr. Sept. 9 at 20-21); and, finally, for 2011, as of the time of the hearing, $424,086.96 (Tr. Sept. 9 at 20:22-24; Pl.'s Ex. 1). These figures solely reflected the sales of products with the Grout Shield mark, and no other logo or mark used by plaintiff. (Tr. Sept. 9 at 33:13-34:9.)

The number of units, or products, that plaintiff sold under the Grout Shield mark (both in the singular and plural form) is, approximately: (1) 14,000 in 2006; (2) 48,000 in 2007; (3) 120,000 in 2008; and (4) 230,000 in 2009. (Def.'s Ex. U ¶ 12.) Plaintiff did not provide comparable figures for 2010 or 2011.

Defendant purchased raw materials for making its grout additive "a year in advance." (Tr. Sept. 12 at 128:19-20.) It invested approximately $885,000 in developing the grout additive. (*Id*. at 81:21-24.) Defendant also spent approximately $26,000 on magazine advertisements and $26,400 on in-store demonstrations. (Decl. of Albert Salvo dated Aug. 19, 2011 in Supp. of Opp. to Order to Show Cause ¶ 24.) Defendant did not introduce evidence of sales figures for its grout additive.

### F.   Discovering Defendant's Use of Grout Shield Mark & Plaintiff's Response

-------

sales by distributors. (Tr. Sept. 9 at 57:25-58:5.) Similarly, the sales figures as of July 2010 do not include sales by distributors. (*Id.* at 37:14-19.)

In November 2009, Stracuzza received a call from Kurt Rapp ("Rapp"), one of plaintiff's contractors, telling him that there was "a company trying to launch a product" under plaintiff's "name." (Tr. Sept. 12 at 45:12-23; Def.'s Ex. U ¶ 17.) Rapp was interested in selling plaintiff's products using the Grout Shield mark but "didn't want to get involved" after he "did a search, and he saw [defendant] trying to do a mark" like plaintiff's.[12] (Tr. Sept. 12 at 47:1-10.) Ultimately, Rapp contracted to sell plaintiff's products but "just named [them] something else." (*Id*. at 47:10.)

On January 18, 2010, plaintiff sent two emails that included copies of entries for defendant's products on Home Depot's website, thereby indicating knowledge of defendant's product being sold at Home Depot. (Def.'s Ex. W.)

In February 2010, plaintiff received an email from Rapp with a link to defendant's website. (Tr. Sept. 9 at 79:7-8, 80:1-9.)

In a letter dated February 1, 2010, plaintiff's counsel indicated to defendant that plaintiff was aware of defendant's trademark application. (Pl.'s Ex. 17 at 1.) The letter explained plaintiff's use of the Grout Shield mark and requested that defendant abandon its application to register

-------

[12]   Stracuzza's deposition testimony, indicating that Rapp was confused over the source of defendant's product, is inconsistent with Stracuzza's testimony during the preliminary injunction hearing suggesting that Rapp understood that defendant's product was different and chose to sell plaintiff's product using a different name. (Tr. Sept. 12 at 47:1-10; Stracuzza Depo. at 53-56.) The Court finds Stracuzza's testimony at the preliminary injunction hearing credible and does not consider Rapp's phone call as evidence of actual confusion.

the Grout Shield mark and to cease and desist from using it in commerce. (*Id*. at 1-2.) The parties attempted to negotiate an amicable resolution to the trademark dispute, but negotiations broke down in February 2011. (Tr. Sept. 9 at 81:4-14; Tr. Sept. 12 at 52:14-16, 143:21-24.)

On August 31, 2010, plaintiff filed an opposition to defendant's application to register the Grout Shield mark in combination with other words and defendant's logo. (Compl. Ex. F at 3.) Plaintiff asserted that it had been using the terms "Grout Shield" and "Grout Shields" in commerce since November 2006. (*Id*. ¶ 1.)

On May 20, 2011, plaintiff filed an application with the United States Patent and Trademark Office to trademark the "GROUT SHIELDS" word mark, without claiming any font, style, size or color of the letters.[13] (Def.'s Ex. D at 1.) Plaintiff disclaimed the use of the word "grout" apart from in combination with the word "shield." (*Id*. at 2.) Plaintiff asserted use of the word mark "[a]t least as early as 11/15/2006." (*Id*.)

On July 15, 2011, plaintiff filed an application to the United States Patent and Trademark Office to trademark a mark that consisted of "the word GROUT on a first line above the word SHIELD on a second line below the first line on a background of a shield. The shield include[d] a banner." (Def.'s Ex. E at 1.) Plaintiff described their product as consisting of "[c]hemical compounds for application with grout as an

additive to a grout mixture before installation and application after installation of the grout." (*Id*. at 2.) Plaintiff claimed use of the mark "[a]t least as early as 11/30/2006." (*Id*.)

On July 15, 2011, plaintiff also filed an application to trademark the word mark "Grout Shield Grout Restoration System" using standard characters. (Compl. Ex. A at 5.)

This action was commenced on July 22, 2011.

## III. CONCLUSIONS OF LAW

### A. Preliminary Injunction Standard

"The preliminary injunction 'is one of the most drastic tools in the arsenal of judicial remedies.'" *Grand River Enters. Six Nations v. Pryor*, No. 02-CV-5068 (JFK), 2006 WL 1517603, at \*6 (S.D.N.Y. May 31, 2006) (quoting *Hanson Trust PLC v. SCM Corp.*, 774 F.2d 47, 60 (2d Cir. 1985)). In order to prevail on a motion for a preliminary injunction, a party must establish: "(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *MyWebGrocer, LLC v. Hometown Info., Inc.*, 375 F.3d 190, 192 (2d Cir. 2004) (quoting *Merkos L'Inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 96 (2d Cir. 2002)). "To establish irreparable harm, plaintiffs must demonstrate an injury that is neither remote nor speculative, but actual and imminent." *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989) (internal quotation marks omitted). A preliminary injunction is not appropriate where monetary damages will

---

[13]   Stracuzza indicated that the application should have requested trademarking of "Grout Shield" in the singular form. (Tr. Sept. 9 at 111:11-24.) However, he also stated that he used "Grout Shields" in the plural form. (*Id*. at 111:20-24) It is unclear if he is filing a separate application to the USPTO to trademark "Grout Shield."

serve as adequate compensation. *Id.* "The law in this circuit requires a showing that irreparable damages are likely, not merely possible." *Iron Mountain Info. Mgmt., Inc. v. Taddeo*, 455 F. Supp. 2d 124, 132 (E.D.N.Y. 2006).

### B. Irreparable Harm

#### 1. Legal Standard

The irreparable harm requirement is "the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1998) (*per curiam*) (internal quotations omitted). "Irreparable injury is one that cannot be redressed through a monetary award. Where money damages are adequate compensation a preliminary injunction should not issue." *JSG Trading Corp. v. Tray-Wrap, Inc.*, 917 F.2d 75, 79 (2d Cir. 1990). In addition, the mere possibility of harm is not sufficient. *Id.* "A successful plaintiff must demonstrate that absent interim relief it will suffer an injury that is neither remote nor speculative, but actual and imminent." *Consol. Brands, Inc. v. Mondi*, 638 F. Supp. 152, 155 (E.D.N.Y. 1986). "'Irreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark . . .' because loss of control over one's reputation is neither 'calculable nor precisely compensable.'" *New York City Triathlon LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 343 (S.D.N.Y. 2010).

In a recent decision, the Second Circuit clarified that "courts must not simply presume irreparable harm. Rather, plaintiff[] must show that, on the facts of their case, the failure to issue an injunction would actually cause irreparable harm." *Salinger v. Cotling*, 607 F.3d 68, 82 (2d Cir. 2010). Though the Second Circuit in

*Salinger* specifically addressed a preliminary injunction in a copyright dispute, it stated that "unless Congress intended a 'major departure from the long tradition of equity practice,' a court deciding whether to issue an injunction must not adopt 'categorical' or 'general' rules or presume that a party has met an element of the injunction standard." 607 F.3d at 77–78 & n. 7. Courts in the Second Circuit have interpreted this language to mean that a presumption of irreparable injury is no longer appropriate in a trademark case where plaintiff can establish a likelihood of confusion. *See, e.g., U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, --- F. Supp. 2d ----, 2011 WL 1842980, at *20 (S.D.N.Y. May 13, 2011) (collecting cases). "[T]he failure to act sooner undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Tough Traveler, Ltd., v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995), *abrogated in part by Salinger*, 607 F.3d 68.

#### 2. Analysis

The Court concludes that plaintiff has failed to demonstrate that it would suffer irreparable harm if its motion for a preliminary injunction is not granted. As an initial matter, Stracuzza makes clear that defendant's product has not affected plaintiff's sales even though defendant's grout additive has been on the market since January 2011. There is no evidence that defendant's grout additive has harmed plaintiff's good will or diverted sales from plaintiff to defendant. Thus, a preliminary injunction is not necessary to prevent irreparable harm to plaintiff.

Furthermore, plaintiff waited too long to request a preliminary injunction. Plaintiff became aware of defendant's product in November 2009 and, in February 2010,

wrote a cease-and-desist letter to defendant requesting that defendant cease using the Grout Shield mark. The parties subsequently engaged in settlement negotiations. However, it is apparent that negotiations broke down in February 2011, but plaintiff did not file its complaint and motion for a preliminary injunction until July 22, 2011. Nor did plaintiff act after being contacted by a customer confused about the source of defendant's product in March 2011.

Under these circumstances, plaintiff's delay in bringing its preliminary injunction motion was unreasonable and undercut plaintiff's argument that its injury was actual and irreparable. *See, e.g., Life Technologies Corp. v. AB Sciex Pte. Ltd.*, No. 11 Civ. 325 (RJH), 2011 WL 1419612, at *7 (S.D.N.Y. Apr. 11, 2011) (concluding that delay between October 2010, when all settlement discussions ceased, and filing of the complaint in January 2011, constituted unreasonable delay); *Richard A. Leslie Co., Inc. v. Birdie, LLC*, No. 07 Civ. 5933 (LAK), 2007 WL 4245847, at *2 (S.D.N.Y. Nov. 26, 2007) ("The period from April 10 through June 8 may be excused . . . on the basis that the parties appear to have been engaged in discussions with a view to resolving the matter. The three month period from June 8 through September 18 cannot. It is sufficiently long, in and of itself, to warrant denial of preliminary relief . . . ."); *Gidatex, S.R.L. v. Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417, 419 (S.D.N.Y. 1998) ("[C]ourts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months.").

In sum, the Court concludes that plaintiff has failed to demonstrate that it would suffer irreparable harm if its motion for a preliminary injunction is not granted. In any

event, in the alternative (as discussed *infra*), the Court concludes that plaintiff has not demonstrated a likelihood of success on the merits. Moreover, even if there are sufficiently serious questions on the merits to make them a fair ground for litigation, plaintiff has not demonstrated that the balance of hardships weigh decidedly in plaintiff's favor.

## C. Likelihood of Success on the Merits

Plaintiff claims that it has demonstrated likelihood of success on the merits for its trademark infringement claim under the Lanham Act, as well as for its common law unfair competition claim.[14] (Pl.'s Letter at 2.) Defendant asserts that plaintiff has failed to demonstrate a likelihood of success on the merits for its trademark infringement claim and that it would be inappropriate for this Court to grant a preliminary injunction on the basis of plaintiff's state law claim because the Court should decline supplemental jurisdiction. (Def.'s Letter at 1 & n. 1.) The Court concludes that plaintiff has failed to demonstrate a likelihood of

---

[14] The Court notes that, although defendant is correct that plaintiff is asserting a trade dress infringement claim in its complaint (Def.'s Letter at 6 n. 6), that claim is not one on which plaintiff is basing its motion for a preliminary injunction. However, plaintiff is asserting in the present motion that defendant's trade dress has contributed to the similarity of, and confusion over, the parties products. (Pl.'s Mot. at 3.) To the extent plaintiff's unfair competition claim encompasses claims for trade dress infringement, the Court concludes for the reasons stated *infra*, that even if plaintiff's trade dress (red shield with banner) is distinctive, the red shield logo only recently came into use and there is no evidence on the record indicating that it has acquired secondary meaning despite plaintiff's allegations to the contrary (Pl.'s Mot. at 5).

success on the merits of its trademark infringement claim.[15]

### 1. Legal Framework

Unregistered marks are protected by Section 43(a) of the Lanham Act, which prohibits any person from using:

> in connection with any goods . . . or any container for goods, . . . any word, term name, symbol, or device, or any combination thereof . . . which . . . is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin, sponsorship, or approval of his or her goods . . . by another person.

15 U.S.C. § 1125(a); *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc*., 973 F.2d 1033, 1038 (2d Cir. 1992) (citing 15 U.S.C. §1125(a)).   In determining trademark infringement under this statute, the court must engage in a two-step analysis: first, it must determine whether the mark is protectable, and then, it must determine whether there is a likelihood of consumer confusion. *Menashe v. V Secret Catologue, Inc.*, 409 F. Supp. 2d 412, 422 (S.D.N.Y. 2006) (citing *Bristol-Myers Squibb Co.*, 973

---

[15]  "[T]he standards for Section 43(a) claims of the Lanham Act and unfair competition claims under New York law are almost indistinguishable." *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, --- F. Supp. 2d ----, 2011 WL 1842980, at *18 (S.D.N.Y. May 13, 2011) (collecting cases).  The only additional element necessary to a successful common law unfair competition claim is bad faith.  *Id.*  For the reasons discussed *infra* with respect to plaintiff's trademark infringement claim under the Lanham Act, including the Court's analysis of defendant's bad faith, the Court concludes that plaintiff has also failed to demonstrate a likelihood of success on the merits of its unfair competition claim.

F.2d at 1039).   As discussed below, the Court concludes that the Grout Shield mark is a descriptive mark, but plaintiff has failed to provide sufficient evidence of secondary meaning at the preliminary injunction stage to demonstrate that the mark is protectable. In the alternative, the Court concludes that there is insufficient evidence of likelihood of confusion to establish a likelihood of success on the merits.

### 2. Distinctiveness of Mark

Defendant contends that the Grout Shield mark is generic or, at best, descriptive with no secondary meaning. (Def.'s Letter at 2.)[16]  Plaintiff counters that its Grout Shield mark is suggestive. (Pl.'s Letter at 3.)  The Court concludes that the Grout Shield mark is not generic.  Instead, it is a descriptive mark with insufficient evidence of secondary meaning at this stage of the litigation to make it a protectable mark under the Lanham Act.

### a.  Legal Standard

"To be valid and protectible [sic], a mark must be capable of distinguishing the

---

[16]  The Court notes that plaintiff is solely contending that defendant has infringed upon plaintiff's Grout Shield mark.  Thus, to the extent plaintiff claims exclusive rights to use the red shield logo separate and apart from the Grout Shield mark, there is no indication that it is claiming defendant is infringing upon plaintiff's use of that logo as a separate trademark.  (Tr. Sept. 9 at 108:14-109:21; Pl.'s Reply at 2.)  The Court's merits analysis, therefore, focuses on the Grout Shield mark.  In any event, even if plaintiff is asserting trademark infringement based on the red shield logo, plaintiff's motion is still denied for the reasons stated *supra* and *infra*.  With respect to this Court's merits analysis specifically, plaintiff has failed to demonstrate that the red shield logo, even if distinctive, has acquired secondary meaning. *See infra.*

products it marks from those of others." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc*., 192 F.3d 337, 344 (2d Cir. 1999). "Courts in the Second Circuit determine whether a mark is distinctive—and thus entitled to protection—with reference to the classification scheme developed by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4 (2d Cir. 1976)." *CJ Prods. LLC v. Snuggly Plushez LLC*, --- F. Supp. 2d ----, 2011 WL 3667750, at *11 (E.D.N.Y. Aug. 22, 2011). According to *Abercrombie & Fitch*, a mark falls into one of four categories:  (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful. *Id.*

Generic trademarks are not entitled to protection. *Id.* "A generic term is one that refers, or has come to be understood as referring, to the genus of which the particular product is a species." *Abercrombie & Fitch*, 537 F.2d at 9; *see also Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 143 (2d Cir. 1997) ("A generic mark is generally a common description of goods, one that refers, or has come to be understood as referring, to the genus of which the particular product is a species." (internal quotation marks omitted)); *Thoip v. Walt Disney Co.*, 736 F. Supp. 2d 689, 703 (S.D.N.Y. 2010) ("Generic marks, which are not entitled to trademark protection, are those 'consisting of words that identify the type or species of goods or services to which they apply, [and that] are totally lacking in distinctive quality.' 'Aspirin,' 'automobile,' and 'shredded wheat,' for instance, are generic marks that are not protectable. Generic marks tend to be nouns that refer to an entire class of products." (internal citations omitted)). "Essentially, a mark is generic if, in the mind of the purchasing public it does not distinguish products on the basis of source but rather refers to the type of product." *Courtenay Comm'ns Corp. v.*

*Hall*, 334 F.3d 210, 214 n. 2 (2d Cir. 2003). Courts look to "whether the consuming public understands and commonly uses the term [at issue] to denote a particular source or origin of a product, even if that source is unknown (in which case the mark is descriptive), as opposed to the nature or class of the product (in which case the mark is generic)." *Jewish Sephardic Yellow Pages, Ltd. v. DAG Media, Inc.*, 478 F. Supp. 2d 340, 360 (E.D.N.Y. 2006). In making this determination regarding a mark's meaning to the consuming public, the Second Circuit has articulated a non-exhaustive list of competent sources that can be considered, "including consumer surveys, testimony of consumers or trade professionals, dictionary definitions, uncontested usage of the mark by competitors to describe their products, generic usage in newspaper and magazine articles, and generic usage by the proponent of the trademark." *Id.*

A descriptive trademark may be protectable under certain circumstances. A mark that is descriptive describes a product, and "conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *Id.* at 357; *see also Genesee Brewing Co.*, 124 F.3d at 143 ("A descriptive mark describes a product's features, qualities or ingredients in ordinary language, or describes the use to which a product is put." (internal citation and quotation marks omitted)); *Thoip*, 736 F. Supp. 2d at 703 ("A descriptive mark is one that describes a product or its qualities, ingredients or characteristics, such as Tasty bread. Descriptive marks tend to be adjectives identifying the special characteristics of an article." (internal quotation marks omitted)).  Descriptive marks "are only protectable if they acquire 'secondary meaning,' *i.e.*, that despite describing the nature of the goods in

question, such marks have come to be associated by the purchasing public over time with a single, albeit anonymous, source." *CJ Products LLC*, 2011 WL 3667750, at *12. The Second Circuit has delineated a set of non-exhaustive factors that can be considered in assessing whether a mark has acquired secondary meaning, namely: (1) advertising expenditures; (2) sales success; (3) unsolicited media coverage of the product; (4) attempts to plagiarize the mark; (5) the length and exclusivity of the mark's use; and (6) consumer studies linking the name to a source. *See Thompson Med. Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir.1985). None of these factors are dispositive and not all have to be satisfied to establish secondary meaning. *Id.*; *CJ Products LLC*, 2011 WL 3667750, at *12 (collecting cases). When a trademark is registered with the USPTO, it is presumed to be a descriptive mark with secondary meaning and, as a result, is considered a valid mark. *See* 15 U.S.C. §§ 1057(b), 1115(a); *see also Heisman Trophy Trust v. Smack Apparel Co.*, 595 F. Supp. 2d 320, 326 (S.D.N.Y. 2009).

Trademarks that are suggestive, fanciful or arbitrary are considered protectable. *See Paddington Corp., Inc. v. Attiki Imps. & Distribs.*, 996 F.2d 577, 584 (2d Cir. 1993). "A suggestive mark employs terms which do not describe but merely suggest the features of the product, requiring the purchaser to use imagination, thought and perception to reach a conclusion as to the nature of goods." *Genesee Brewing Co., Inc.*, 124 F.3d at 143; *see also CJ Products LLC*, 2011 WL 3667750, at *11. A fanciful mark "usually applie[s] to words invented solely for their use as trademarks. When the same legal consequences attach to a common word, *i.e.*, when it is applied in an unfamiliar way, the use is called 'arbitrary.'" *Genesee Brewing Co., Inc.*, 124 F.3d at 143.

## b. Analysis

### i. Grout Shield Mark Is Not Generic

Defendant argues that "Grout Shield" "generically describe[s] the genus of grout care products that seals and protects grout from stain and damage." (Def.'s Opp. at 9.) In support of its argument, defendant asserts that plaintiff's competitors have used the Grout Shield mark as a "generic descriptor" or as part of their trademark. (*Id.* at 9-10; Def.'s Letter at 4.) Further, defendant relies on the dictionary definitions of "grout" and "shield" to demonstrate that the words are being used in a generic way to describe a grout protectant. (Def.'s Opp. at 9.) Finally, defendant claims that because the Grout Shield mark has not already been registered as a word mark means that it is generic. (*Id.* at 10.) Plaintiff counters that the Grout Shield mark is not generic because defendant failed to disclaim "shield" in its trademark application and the USPTO did not require defendant to disclaim "shield."[17] (Pl.'s Reply at 2.) In addition, plaintiff contends that the dictionary definition of "shield" does not support defendant's argument. Plaintiff claims that "shield" is defined as a cover, barrier, or protective structure that is separable from its bearer; plaintiff's products, allegedly to the contrary, "*seal* and become an inseparable part of the grout" so that a generic trademark for plaintiff's products would be "grout seal," not "grout shield." (*Id.* at 7-8.) As a result, plaintiff argues that the Grout Shield mark is suggestive because plaintiff's products are "neither protective covers nor barriers" and the word "shield" in the Grout Shield mark implies that plaintiff's products have "the attribute of strength." (*Id.* at 9.)

---

[17] The Court addresses these arguments based on defendant's trademark application *infra* with respect to its discussion of whether the Grout Shield mark is descriptive or suggestive.

16

The Court concludes that the Grout Shield mark is not generic. There is insufficient evidence in the record to demonstrate that the Grout Shield mark is being used by plaintiff's competitors as a generic descriptor. Defendant solely points to one instance in which a company used "grout shield" generically to promote the products it was selling. Specifically, defendant pointed to the Carpet Cleaners website, which states:

> [You] can help protect your grout color by adding a grout shield to your order. Typically a spray-on application, these shields can help preserve your colors. Grout shield can usually be purchased as an add-on to your tile order or can be applied periodically over the life of your tile floor. Spray-on grout shields are easy to apply and provide an extra level of protection for your investment.

(Def.'s Opp. Ex. 4 at 2; Def.'s Letter at 4.) The Court concludes that this one instance of using the terms "grout shield" to describe products that protect the color of grout is insufficient to demonstrate that "the relevant public understand[s] the designation primarily to refer to that class of goods or services." (*Id.* (citing *H. Marvin Ginn Corp. v. Inter'l Ass'n of Fire Chiefs, Inc.*, 782 F.2d 987, 990 (Fed. Cir. 1986)).)

Nor has defendant demonstrated that the general public views the Grout Shield mark as describing a class of products.[18]

Defendant's reliance on the use of the Grout Shield mark as a trademark by other companies is unpersuasive in demonstrating that the mark is a generic description of a class of products. Defendant has pointed to three instances in which the Grout Shield mark has been used by other companies as part of its trademark; defendant also relied on the use of the words "grout" and "shield separately in one trademark.[19] (Def.'s Letter at 4; Tr. Sept. 12 at 135:7; Def.'s Ex. P, R, S.) However, the fact that others have been using the Grout Shield mark in their trademark does not mean that it is generic. Other companies, like plaintiff's, may believe that the Grout Shield mark, in combination with other terms in their trademark, can help the general public identify their product in the marketplace; it does not mean that the Grout Shield mark has been accepted by the general public as describing the "nature or class of the product"—namely, that it cleans grout, as well as seals and protects its color. In any event, the use of the Grout Shield mark by four other companies, in addition to the parties, is not sufficient evidence to rise to the level of general acceptance by the public of the generic nature of the Grout Shield mark.[20]

---

[18] The fact that others have not registered the Grout Shield mark by itself, as opposed to in combination with other features or words, does not mean that it is inherently generic. (Def.'s Opp. at 10.) There are many reasons why companies may not have applied to trademark the Grout Shield mark, such as not having the need to do so because they preferred a trademark

with other features.

[19] The Court notes that this analysis is not affected by defendant's submission after the preliminary injunction hearing of evidence on another product using "Grout Shield" as part of its trademark. *See supra*. Even considering that evidence, the Court's conclusion is the same.

[20] The Court is unconvinced by defendant's reliance on the dictionary definition of "shield." It is apparent that the word "shield" does not have any inherent meaning that, when used in combination with "grout," reveals the nature of the class of products at issue. The dictionary definition does not, for example, automatically

In sum, the Court concludes that the Grout Shield mark is not generic. *See, e.g., CJ Products LLC*, 2011 WL 3667750, at *14 ("The term 'Pillow Pet' has no inherent meaning, and does not describe the genus of a particular class. As plaintiffs point out in their papers, the genus at issue here is plush stuffed toys, not pillow pets.").

### ii. Grout Shield Mark is Descriptive with Insufficient Evidence of Secondary Meaning

Defendant argues, in the alternative, that the Grout Shield mark is descriptive because it "immediately conveys the impression that Plaintiff's product protects grout." (Def.'s Opp. at 11.)  Defendant also asserts that plaintiff has failed to offer sufficient evidence of secondary meaning of the Grout Shield mark. (*Id*. at 12-13; Def.'s Letter at 5-6.) Plaintiff counters that its trademark is suggestive because it requires the imagination to transition from a definition of shield that is a cover or barrier to its connotation of strength as used in plaintiff's mark. (Pl.'s Reply at 9.) Plaintiff asserts that a Grout *Seal* mark would require no imagination to determine the nature of the goods being sold. (*Id*. at 7-9.) In addition, plaintiff also claims that the word "shield" is suggestive in the context of its products. (Pl.'s Letter at 3.) Furthermore, plaintiff makes various arguments regarding disclaimers in defendant's USPTO application and the status of its own trademark application, which were described

in more detail *supra*. Having carefully reviewed the parties' submissions and the evidentiary record before the Court from the preliminary injunction hearing, the Court concludes that the Grout Shield mark is descriptive, and that plaintiff has failed to demonstrate at this stage that it has acquired secondary meaning. Thus, it is not protectable at this stage of the litigation.[21]

### (1) Descriptiveness of Grout Shield Mark

As noted above, "[a] term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods." *Bernard v. Commerce Drug Co.*, 964 F.2d 1338, 1341 (2d Cir. 1992).  On the other hand, "[a] term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods." *Id.* "[A]

---

[21] To the extent plaintiff relies on the red shield logo's use of the Grout Shield mark to argue that the Grout Shield mark is distinctive, the Court finds that argument meritless. The shield in and of itself is descriptive of the services being provided by plaintiff and, therefore, does not rise to the level of a suggestive mark. *See, e.g., In re Underwater Connections, Inc.*, 221 U.S.P.Q. 95, 95 (TTAB 1983) ("The rule has also been applied to subject matter sought to be registered in respect of services where the pictorial representation is of an article which is an important feature or characteristic of the services," concluding that a "stylized drawing of a compressed gas tank used in dividing" for a company arranging driving tours was descriptive (collecting cases)).  *See infra* on discussion of weight to be given to TTAB decisions. There is no evidence whatsoever that the red shield, which only came to be used by plaintiff over the past year, has come to be associated with plaintiff. Further, as discussed *infra*, plaintiff has failed to proffer sufficient evidence of actual confusion over the parties' use of the Grout Shield mark, let alone evidence specific to confusion over the red shield logo.

---

imply a specific type of product that protects the grout's color, as opposed to cleaning the grout or protecting its consistency. Instead, as discussed in detail *infra*, the word "shield" describes the intended use and effect of plaintiff's products. In any event, the Court notes that while dictionary definitions are relevant, they are not "determinative" of a mark's generic nature. *See Brandwynne v. Combe Int'l, Ltd.*, 74 F. Supp. 2d 364, 381 (S.D.N.Y. 1999).

term can be descriptive if it describes the purpose or utility of the product," or "an immediate idea of some characteristic or attribute of the product," such as its use or the effect the product is meant to produce. *Id*.

The Court concludes that the Grout Shield mark is descriptive because it describes the purpose and effect of plaintiff's products. Plaintiff's products clean grout, chemically react with grout to seal in the grout's color, and can be applied to grout to enhance its color. Stracuzza testified that defendant's product competes with his because it "protects grout." (Tr. Sept. 9 at 93:14-19.) The definition of "shield" in the Grout Shield mark clearly conveys that its purpose and effect is to "protect or defend" grout. MERRIAM-WEBSTER ONLINE DICTIONARY, www.merriam-webster.com/dictionary/shield, last visited October 14, 2011. The Grout Shield mark does not require "imagination, thought and perception" to reach a conclusion that plaintiff's products are intended to protect grout.

The Court finds meritless plaintiff's arguments for why the Grout Shield mark should be deemed suggestive based on the action, or inaction, of the USPTO on the parties' trademark applications. Plaintiff asserts that the word "shield" is descriptive because: (1) defendant did not disclaim it in its trademark application (Pl.'s Reply at 2); (2) the USPTO did not require defendant to disclaim "shield" in that application though it required that "grout" and "sealants company" be disclaimed (*id*.); and (3) the USPTO did not deny plaintiff's application on the grounds that the Grout Shield mark was descriptive, but, instead, suspended it pending disposition of defendant's application allegedly because of a "likelihood of confusion between the two

marks" (Pl.'s Letter at 1-2). Plaintiff's arguments are entirely without merit.

Defendant may, but is not required to, disclaim any part of its proposed trademark in the trademark application. *See* 15 U.S.C. § 1056(a) ("An applicant may voluntarily disclaim a component of a mark sought to be registered."). Furthermore, the USPTO "may require the applicant to disclaim an unregistrable component of a mark otherwise registrable," but, once again, is not required to do so. *Id*.; *see also In re Nat'l Data Corp.*, 753 F.2d 1056, 1059 (Fed. Cir. 1985) ("The power of the [US]PTO to accept or require disclaimers is discretionary under the statute, and its practice over the years has been far from consistent." (internal citation omitted)) In any event, "it is inappropriate to give the presence or absence of a disclaimer any legal significance" where the USPTO's "practice over the years has been far from consistent" in requesting disclaimers.[22] *Id*. Finally, the fact that plaintiff's trademark application was suspended has no bearing on

_____

[22] The parties provided the Court with a list of live trademark applications that disclaimed the word "shield." (*See* Tr. Sept. 12 at 170:15-171:16, Decl. of Jayne Conway Hunter ("Hunter Decl.") Ex. A; Pl.'s Letter Ex. B-D.) However, it is unclear if the trademark applicants themselves had disclaimed "shield," or if the USPTO had required the disclaimer. As a result, the Court gives little weight to this evidence in support of the parties' arguments regarding the consistency, or lack of consistency, of the USPTO in requiring disclaimers. Furthermore, to the extent defendant is using this list to suggest that the word "shield" is descriptive, the Court, once again, finds the list of little weight on that point. It is unclear based on the list provided by defendant the actual purpose of the product for which the requested trademark is being used. Thus, it is impossible for the Court to determine whether or not the word "shield" is descriptive or suggestive in the context of the product itself.

whether or not the USPTO considers the Grout Shield mark valid or confusingly similar to defendant's requested trademark. The USPTO informed plaintiff that "a mark in a prior-filed pending [trademark] application may present a bar to registration" of plaintiff's mark.   (Pl.'s Letter Ex. A at 1.)  It further indicated that "action on [plaintiff's] application may be suspended pending final disposition of the earlier-filed referenced application."   (*Id*.) The USPTO was simply alerting plaintiff that a previous application *may* bar plaintiff's application, which *may* be suspended. *See, e.g., Everest Capital Ltd. v. Everest Funds Mngmt, L.L.C.*, 393 F.3d 755, 764 (8th Cir. 2005) ("The Trademark Office suspension notice had little probative value because it stated a tentative opinion, not an administrative finding of fact based upon an adequate record[,]" concluding that the district court did not abuse its discretion in refusing to admit evidence of the USPTO's suspension.).

Finally, the Court also disagrees with plaintiff's conclusion that the USPTO has "expressly determined that 'shield' is suggestive." (Pl.'s Letter at 3.)  In support of its argument, plaintiff relies on the decision of the Trademark Trial and Appeal Board ("TTAB") in *In re Cleaning Systems, Inc.*, No. 77378860, 2010 WL 667927 (Trademark Tr. & App. Bd. Jan. 27, 2010). As an initial matter, the Court notes that the decisions of the TTAB are owed "great weight when they bear on [an] issue" and "certainly can provide guidance."     *Rebel Debutante LLC v. Forsythe Cosmetic Grp., Ltd.*, --- F. Supp. 2d ----, 2011 WL 2620450, at *12 n. 9 (M.D. N.C. July 1, 2011) (internal quotation marks omitted) (citing *Int'l Bancorp, LLC v. Societe des Bains de Mer et du Cercle des Etrangers a Monaco*, 329 F.3d 359, 379 (4th Cir. 2003)).   The Court concludes that the TTAB in *In re Cleaning Systems* did not determine that

"shield" was suggestive.   The TTAB was not using "suggestive" as a word-of-art to imply a mark's protectability.   Instead, it was using the word to analyze the degree of similarity of the marks at issue, ultimately concluding that they were so similar as to suggest they both originated from the same source.

In *In re Cleaning Systems*, the products at issue were "Wheel Shield" and "Tire Shield." *In re Cleaning Systems, Inc.*, 2010 WL 667927 at *1. Both products "provide coating and protection for the tires and wheels of a vehicle."   *Id*.   "Wheel Shield" was a registered mark; "Tire Shield" was solely applying for trademark registration. *Id*. at *1, *4.   The TTAB affirmed the USPTO's refusal to register "Tire Shield" because there was a likelihood of confusion over the source of the products even though they were intended for use on different parts of the wheel.   *Id*. at *2, *4.   The TTAB determined that, because the word "shield" in both marks was "suggestive of both types of goods, this identical term must be considered to be the dominant source-identifying matter in both marks. There is nothing in the record to suggest this is a particularly weak term for products such as those of applicant and those of registrant. It also conveys the same suggestive meaning in both marks."   *Id*. at *3.   Thus, when the TTAB found "shield" to be suggestive, it was simply saying that the way "shield" was used in both marks led to a likelihood of confusion among the average consumers over the source of the two products.   The question before the TTAB was not whether or not the "Tire Shield" mark was suggestive or descriptive.   Furthermore, the opinion does not explain whether the "Wheel Shield" mark was registered because it was descriptive with secondary meaning, or because it was suggestive.   The use of the word "suggestive" by the TTAB to describe the meaning of both marks was

not being utilized as a term of art to describe the validity of the marks at issue; rather, it was simply used to compare the meaning of the two marks.  The TTAB was trying to make the point that the average consumer would assume that Tire and Wheel "Shields" were produced by the same company.[23]

Contrary to plaintiff's assertion that "shield" is suggestive, the Court has found decisions by the TTAB indicating that "shield" is, in fact, descriptive.  For example, in *Andersen Corp. v. Therm-O-Shield Int'l, Inc.*, 226 U.S.P.Q. 431 (TTAB 1985), the TTAB concluded that the use of the word "shield" in the trademark "Therm-O-Shield" was not suggestive, where the product was a film intended to be applied to windows in order to control heat and glare.[24] *Id*. at 433-34.  On the other hand, the TTAB also determined that "shield" was suggestive in the mark "Perma-Shield" where it was used on windows and window units for the same purpose.  *Id*. at 432, 434.  In another

opinion, the TTAB determined that the use of "shield" in the trademark "Airshield" was descriptive, rather than suggestive, where the product was used for "wind deflectors for vehicles."  *Saunders v. Air-Flo Co.*, 196 U.S.P.Q. 168, 175 (TTAB 1977), *rev'd in part on other grounds,* 646 F.2d 1201 (7th Cir. 1981).

In sum, whether a proposed trademark is descriptive or suggestive depends on the analysis of the entire trademark, not just a particular word, and the purpose of the products on which it is used.  For the reasons stated above, the Court concludes that the Grout Shield mark is descriptive of the purpose and intended effect of plaintiff's products in protecting and defending grout from stains and discoloration.

(2) Secondary Meaning

A trademark acquires secondary meaning if "it may be proved as a matter of fact that the mark connotes a single source of origin to the public consumer or secondary meaning may be established through registration of a trademark." *Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir. 1993). "Six factors are relevant to determining whether a mark has acquired secondary meaning: (1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use."  *Erchonia Corp. v. Bissoon*, 410 F. App'x 416, 418 (2d Cir. 2011) (internal quotation marks omitted) (citing *Centaur Commc'ns v. A/S/M Commc'ns*, 830 F.2d 1217, 1222 (2d Cir. 1987)).  None of the factors are dispositive. *Id*. Secondary meaning is "established *only* in cases where an ordinary buyer associates the mark in question with a single source . . . ."  *Id*. (emphasis in original).  The burden of

---

[23]   The Court notes that the TTAB has used "suggestive" in other instances that indicate the word was not being used to address the validity of a mark.  As an example, in *Andersen Corp. v. Therm-O-Shield Int'l, Inc.*, 226 U.S.P.Q. 431, 434 (TTAB 1985), the TTAB used "suggestive" as identifying a "function and/or characteristic of the goods of the parties," which is clearly not the way that "suggestive" has been used in the Second Circuit to characterize a strong or protectable mark.  Ultimately, the TTAB was performing the same analysis in addressing validity as is required in the Second Circuit, but was simply using the term "suggestive" differently.

[24]   To the extent plaintiff implies that its products do not create a literal "shield" or barrier on the grout, that is incorrect.  Though plaintiff's products react with the grout, the products are literally brushed onto the grout so that plaintiff's use of "shield" is comparable to that of "Therm-O-Shield," which the TTAB found to be a descriptive mark.

proof is on plaintiff to demonstrate that its mark acquired secondary meaning. *Id.* "Actual confusion 'shows at least some amount of secondary meaning.'" *New York State Elec. & Gas Corp. v. U.S. Gas & Elec., Inc.*, 697 F. Supp. 2d 415, 430 (W.D.N.Y. 2010) (collecting cases); *see also ERBE Elektromedizin GmbH v. Canady Tech. LLC*, 629 F.3d 1278, 1290 (Fed. Cir. 2010) (listing actual confusion as a factor in analyzing secondary meaning).    It is uncontested that plaintiff has not registered the Grout Shield mark.  The Court concludes that plaintiff has failed to proffer sufficient evidence to demonstrate that the public consumer associates the Grout Shield mark with plaintiff's products.

Plaintiff's advertising expenditures do not weigh in favor of finding secondary meaning.    Plaintiff provided a log delineating its spending on advertising between 2009 and 2011.  However, it is also apparent that, since 2006, plaintiff has used a number of different marks in commerce to sell its products.[25]  (Tr. Sept. 9 at 118:9-12.) It is unclear whether plaintiff's advertising expenditures were made solely to promote the Grout Shield mark.  Stracuzza also testified that two of plaintiff's distributors, who are allowed to actually sell plaintiff's products under the Grout Shield mark, also spend money on advertising plaintiff's products.    However, plaintiff failed to specify a sum.    Overall, plaintiff's advertising expenditures do not favor finding secondary meaning.

Plaintiff does not fare much better with the remaining *Centaur* factors.  As noted above, plaintiff did not commission any consumer studies.  There appears to be some unsolicited media coverage of plaintiff's products.  However, only three out of the five media articles relied on by plaintiff actually discussed his products. Furthermore, two out of those three were very recent:   one was published several weeks prior to plaintiff filing its complaint, and the other was published in September of 2011.  The remaining article was published in 2009.  As a result, the Court concludes that unsolicited media coverage does not weigh significantly in plaintiff's favor.  The evidence of unsolicited media coverage does not strongly support plaintiff's argument that consumers developed an association between the Grout Shield mark and plaintiff.

The sales success of plaintiff's product does favor finding secondary meaning. Plaintiff's sales figures from 2007 until 2011 for products with the Grout Shield mark demonstrate a steady increase in sales so that preliminary figures for 2011 show more than $400,000 in product sales.

Regarding       defendant's       alleged plagiarism of the Grout Shield mark, the Court concludes that defendant did not act in bad faith, as discussed in detail *infra*, which is central to the plagiarism inquiry.  *See, e.g, Dudley v. HealthSource Chiropractic, Inc.*, 585 F. Supp. 2d 433, 439 (W.D.N.Y. 2008); *Real News Project, Inc. v. Independent World Television, Inc.*, No. 06 Civ. 4322(GEL), 2008 WL 2229830, at *13 (S.D.N.Y. May 27, 2008).  As stated above, the  Court  finds  credible  defendant's testimony that it was not aware of plaintiff's Company or mark, and that it decided to use the Grout Shield mark in combination with a logo because it found it most descriptive of its product.

---

[25]   In fact, it is unclear whether the Grout Shield mark was plaintiff's dominant, most frequently used mark.    As noted above, the Court determined that the red shield logo only came into use over the past year.  However, it is unclear how consistently plaintiff used other marks, such as "GROUTSHIELD" or the gladiator mark.

As noted above, though plaintiff has used the Grout Shield mark since 2006, it was not plaintiff's exclusive mark.  *See supra* note 26.  Thus, it is unclear why a consumer would necessarily associate the Grout Shield mark, as opposed to some other version of the mark, with plaintiff.

In sum, plaintiff has failed to demonstrate secondary meaning of the Grout Shield mark.  Its advertising expenditures do not clearly reflect use of the Grout Shield mark, as compared to other trademarks plaintiff has used.  There are only a handful of articles from media outlets that discuss plaintiff's product, with two out of the three either immediately preceding or following the commencement of this litigation.  The Grout Shield mark was not used exclusively by plaintiff as of 2006.  Nor did defendant plagiarize the Grout Shield mark in bad faith.  Although the sales figures show strong and improving sales of plaintiff's products using the Grout Shield mark, this factor is clearly outweighed by the other above-referenced factors.  To the extent plaintiff relies on instances of actual confusion to demonstrate secondary meaning, the Court finds that argument unpersuasive.  *See infra* for a detailed analysis in the context of consumer confusion.

### 3. Consumer Confusion

The Court also concludes that plaintiff has failed to demonstrate that there is a likelihood of consumer confusion.  In order to determine whether there is a likelihood of confusion, a court must balance the eight factors set forth by the Second Circuit in *Polaroid Corporation v. Polarad Electronics Corporation*, 287 F.2d 492 (2d Cir. 1961), which are: "(1) strength of the trademark;   (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4)

evidence that the senior user may "bridge the gap" by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market."  *Star Indus. v. Bacardi & Co*., 412 F.3d 373, 384 (2d Cir. 2005).  The Court concludes that, at this stage of the litigation, plaintiff has failed to carry its burden of demonstrating a likelihood of consumer confusion where most of the *Polaroid* factors weigh against a finding of confusion by consumers.

### a.  Strength of the Trademark

The strength of the Grout Shield mark refers to "its tendency to identify the goods sold under the mark as emanating from a particular source."  *Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 873 (2d Cir. 1986); *see also U.S. Polo Ass'n, Inc.*, 2011 WL 1842980, at *8.  The analysis focuses on both "inherent" and "acquired" distinctiveness.  *Brennan's Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 130-31 (2d Cir. 2004).

Plaintiff's mark is weak because it has not acquired secondary meaning for the reasons stated *supra*.   *See Edmiston v. Jordan*, No. 98 Civ. 3928(DLC), 1999 WL 1072492, at *8 (S.D.N.Y. Nov. 24, 1999) ("Plaintiff's mark, unsupported by evidence of secondary meaning, is weak.").

### b.  Similarity

This factor "attempts to discern whether the similarity of the marks is likely to cause confusion among potential customers."  *Louis Vuitton Malletier v. Burlington Coat Factory Warehouse, Corp.*, 426 F.3d 532, 537 (2d Cir. 2005) (internal quotation marks omitted).  This assessment includes analysis

of the similarity between the marks in question in "appearance, sound, and meaning." *U.S. Polo Ass'n, Inc.*, 2011 WL 1842980, at *8. Courts "analyze the mark[s'] overall impression on a consumer, considering the context in which the marks are displayed and the totality of factors that could cause confusion among prospective purchasers." *Louis Vuitton*, 426 F.3d at 537 (internal quotation marks omitted). "When the products being compared will not be displayed side-by-side in the marketplace . . ., the appropriate question is not whether differences are easily discernible on simultaneous viewing, but whether they are likely to be memorable enough to dispel confusion on serial viewing." *U.S. Polo Ass'n, Inc.*, 2011 WL 1842980, at *9 (internal quotation marks omitted) (citing *Louis Vuitton*, 426 F.3d at 538).

Although there is an obvious similarity between the marks in the use of the term Grout Shield, there are also some substantial dissimilarities in the context in which the marks are displayed and the totality of the factors regarding potential confusion. As a threshold matter, the products look very different. Each mark has a different font, a different design, and a different color scheme. In addition, the defendant's mark also includes the "Miracle Sealants' Company" name, which decreases the likelihood of consumer confusion. Moreover, the defendant's mark includes the "three-peaks" design element consisting of three blue trapezoids on one end that appears on all MSC products, which is distinct from plaintiff's mark. In fact, plaintiff has used many variants of the Grout Shield mark, including, *inter alia*, a multi-colored GROUTSHIELD mark, a "GROUT SHIELD" mark with an image of a warrior, a "GROUT SHIELD" mark in a white font with red background.

In sum, the Court does not conclude that an unsophisticated consumer may find the parties' use of the Grout Shield mark similar, potentially leading to confusion over the source of the products.

c. Proximity

This factor "concerns whether and to what extent the two products compete with each other." *Cadbury Beverages Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996). Courts "look to the nature of the products themselves and the structure of the relevant market. Among the considerations germane to the structure of the market are the class of customers to whom the goods are sold, the manner in which the products are advertised, and the channels through which the goods are sold." *Id.* (internal quotation marks and citations omitted). "[T]he closer the secondary user's goods are to those the consumer has seen marketed under the prior user's band, the more likely that the consumer will mistakenly assume a common source." *Virgin Enterprises v. Nawab*, 335 F.3d 141, 150 (2d Cir. 2003). "Moreover, competitive proximity must be measured with reference to the first two *Polaroid* factors." *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987).

The Court concludes that the parties' products do not directly compete and, therefore, lack proximity. Though, as noted above, there are similarities between the parties' use of the Grout Shield mark, defendant's product is marketed as an additive while plaintiff's products are intended for topical application. The Court finds unconvincing plaintiff's argument that its products *can* be mixed in with grout. The labels for plaintiff's products clearly require topical application and plaintiff has failed to present evidence indicating that customers are purchasing plaintiff's products to add

them to grout.  Clearly the parties' products are intended to protect the color and consistency of grout.  However, the way they are primarily used defeats proximity.

### d.  Bridging the Gap

This *Polaroid* factor focuses on the likelihood that a senior trademark user that is not directly competitive with the junior trademark user will expand its business so as to bridge the gap between its own and the junior user's market.  *See Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 397 (2d Cir. 1995).  This factor "is irrelevant . . . where . . . the two products are in direct competition with each other."  *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 115 (2d Cir. 2009); *see also Star Indus.*, 412 F.3d at 387 (concluding that "[b]ecause . . . [the] products are already in competitive proximity, there is really no gap to bridge, and this factor is irrelevant to the *Polaroid* analysis").

Plaintiff claims that it intends to expand into retail and has already begun to do so in the New York tri-state area.  Plaintiff further asserts that defendant's stake in Home Depot and with other distributors using the Grout Shield mark will make it impossible for plaintiff to "bridge the gap" and expand its business into retail stores.  In making its arguments, plaintiff misses the point of this *Polaroid* factor, which specifically focuses on the products' competitiveness.  As noted above, the parties' products are not in direct competition because of the differing nature of the product, but because of the differing distribution network.  There is no evidence on record that plaintiff intends to market a grout additive, or that defendant intends to expand its line of products using the Grout Shield mark in any way.  Thus, there is no indication that either party intends to "bridge the gap" to come into direct competition.  It is therefore unclear how plaintiff will be hampered from selling at Home Depot or in other retail stores products that are intended to be used in a manner completely different from that of defendant's grout additive, and some of which, such as plaintiff's color enhancer or clear, are admittedly different from defendant's product.  Thus, based on the evidence presented to the Court at this stage of the proceedings, this *Polaroid* factor is not relevant to the Court's analysis because the parties' products will not directly compete against each other even if plaintiff were to sell more of its products through retail.

### e.  Actual Confusion

Lacking proof of actual confusion "is not fatal to a finding of likelihood [of confusion], particularly where, as here, the junior mark has been in the marketplace for a relatively short period of time."  *Pfizer Inc. v. Sachs*, 652 F. Supp. 2d 512, 523 (S.D.N.Y. 2009).  "Evidence of actual confusion consists of (1) anecdotal evidence of confused consumers in the marketplace; and (2) consumer survey evidence."  *Jordache Enterprises, Inc. v. Levi Strauss & Co.*, 841 F. Supp. 506, 518 (S.D.N.Y. 1993).  "Evidence of actual confusion is a strong indication that there is a likelihood of confusion."  *Tripledge Products, Inc. v. Whitney Resources, Ltd.*, 735 F. Supp. 1154, 1162 (E.D.N.Y. 1990).  "[F]ailure to present its own consumer survey weighs against a finding of consumer confusion" in plaintiff's favor.  *Star Indus.*, 412 F.3d at 388; *see also Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 269 F.3d 114, 124 (2d Cir. 2001) ("The lack of survey evidence counts against finding actual confusion.").  The Court concludes that this factor does not weigh in plaintiff's favor because the evidence of actual confusion presented by plaintiff is *de minimis*.

There is some evidence of actual confusion from six individuals, who contacted plaintiff to inquire about defendant's product believing plaintiff was selling it. "Evidence of only a small number of instances of actual confusion may be dismissed as *de minimis*." *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 398 (4th Cir. 2009). Evidence of actual confusion "must be placed against the background of the number of opportunities for confusion before one can make an informed decision as to the weight to be given the evidence." *Id.* The Court concludes that six instances are *de minimis* evidence of actual confusion in light of plaintiff's sales. Although plaintiff was unable to provide the number of units, or products, sold under the Grout Shield mark for 2010 or 2011, in 2009 plaintiff sold approximately 230,000 units.[26] Between 2006 and 2009, the number of units sold has been steadily increasing. For example, in 2008, plaintiff sold approximately 120,000 units. In light of this steady increase in the number of units sold, and the fact that plaintiff's sales have not been affected by defendant's product, the Court concludes that six instances of actual confusion in late 2010 and in 2011 are *de minimis* in light of plaintiff's projected sales for those years. *See e.g, C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir. 1985) (district judge did not err in failing to consider four isolated instances of actual confusion); *La Cibeles, Inc. v. Adipar, Ltd.*, No. 99 Civ. 4129 (AGS), 2000 WL

1253240, at *9-10 (S.D.N.Y. Sept. 1, 2000) ("Here, plaintiff has proffered *de minimis* evidence of actual confusion. . . . evidence of actual confusion is negligible given the small number of people who allegedly expressed confusion and the absence of a valid statistical sample," further noting that plaintiff failed to introduce evidence of a single instance where a customer purchased defendant's product over its own (collecting cases)); *George & Co. LLC*, 575 F.3d at 399 ("If there is a very large volume of contracts or transactions which could give rise to confusion and there is only a handful of instances of actual confusion, the evidence of actual confusion may receive relatively little weight."); *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1092–93 (10th Cir. 1999) (seven instances of actual confusion was *de minimis* and did not raise a genuine issue of material fact on likelihood of confusion). *Cf. RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1061 (2d Cir. 1979) (actual confusion established with evidence from two witnesses alongside a consumer study demonstrating a fifteen-to-twenty percent rate of confusion among takers).[27] In sum,

---

[26] The Court notes that the sales figures include both the use of "Grout Shield" and "Grout Shields." However, the Court concludes that the sales figures are nevertheless relevant to the analysis of actual confusion, especially because "Grout Shield" and "Grout Shields" are nearly identical. Further, it is apparent that for 2011 plaintiff's labels include the Grout Shield mark on the red shield logo. *See supra*.

[27] Cases cited by plaintiff are distinguishable. In *Caviaria*, it is unclear how many instances of actual confusion were proffered; the Court simply states that there was "at least one customer" who was confused. *Madison Ave. Caviarteria, Inc. v. Caviaria.Com*, No. 04 Civ. 0493(RO), 2004 WL 744481, at *2 (S.D.N.Y. Apr. 7, 2004). In *Coolbrands*, plaintiff relied on a handful of instances of actual confusion that occurred, unlike in this case, only "in the few short weeks after defendants first launched." *Fruit-Ices Corp. v. Coolbrands Int'l, Inc.*, 335 F. Supp. 2d 412, 427 (S.D.N.Y. 2004). Finally, in *All Granite*, the court actually concluded that confusion by four customers *did not* rise to the level of actual confusion; rather, their testimony only weighed "slightly in favor" of plaintiff. *Artisan Mfg. Corp. v. All Granite & Marble Corp.*, 559 F. Supp. 2d 442, 452 (S.D.N.Y.

the Court concludes that this *Polaroid* factor does not weigh in plaintiff's favor.

### f. Bad Faith

"Courts and commentators who have considered the question equate a lack of good faith with the subsequent user's intent to trade on the good will of the trademark holder by creating confusion as to source or sponsorship." *EMI Catalogue Partnership v. Hill, Holliday, Connos, Cosmopulos Inc.*, 228 F.3d 56, 66 (2d Cir. 2000). Thus, "the only relevant intent is intent to confuse." *Starbucks*, 588 F.3d at 97 (internal quotation marks omitted). Bad faith "can be found where prior knowledge of the senior user's mark or trade dress is accompanied by similarities so strong that it seems plain that deliberate copying has occurred." *U.S. Polo Ass'n, Inc.*, 2011 WL 1842980, at \*17; *see also Paddington Corp. v. Attiki Imps. & Distrib. Inc.*, 996 F.2d 577, 587 (2d Cir. 1993) ("Intentional copying, of course, does not require identical copying. Where the copier references the prior dress in establishing her design with the apparent aim of securing the customers of the other based on confusion, intentional copying may be found."). The Court concludes that plaintiff has failed to present credible evidence of bad faith on the part of defendant in using the Grout Shield mark.

The Court finds credible Salvo's testimony that none of defendant's employees met plaintiff at a trade show in 2008 or 2009 (Pl.'s Mot. at 7), and that there was no record of receiving plaintiff's business card at those events. Defendant came up with the Grout Shield mark in 2009, determining that the mark best described the grout additive. There is no credible evidence that defendant started using the Grout Shield mark in order to steal

plaintiff's clientele or to otherwise cut plaintiff out of the market for grout protectants.

The Court finds meritless other arguments relied on by plaintiff to suggest bad faith by defendant. The Court concludes, despite plaintiff's assertions to the contrary (Pl.'s Letter at 8), that defendant's color scheme on its bottles is not similar to that used by plaintiff and does not demonstrate bad faith on the part of defendant. Defendant's bottle is silver-grey, while plaintiff's is beige. Further, defendant continued to use the three-peak symbol, which it had used on other products, even though it departed from the blue color it had previously used for product bottles. (Pl.'s Ex. 16.) Defendant hired a firm to do a trademark search when it decided to use the Grout Shield mark and there is no evidence on record, despite plaintiff's allegations to the contrary, that defendant somehow limited its attorney's search, or was otherwise aware of the parameters and results of the search performed by counsel. (Pl.'s Letter at 8.) The use of similar or identical keywords in advertising its product, without more, does not imply defendant acted in bad faith. (*Id.*) In addition, even if Salvo asked defendant's technical support team to determine whether groutshield.com was an available domain name (*id.*), plaintiff has presented no evidence whatsoever that Salvo was notified that the domain name was taken. The Court finds credible Salvo's testimony that he was not aware of plaintiff, or that plaintiff was using the Grout Shield mark. Finally, the Court finds meritless plaintiff's argument that defendant acted in bad faith by "launching" its product after it became aware that plaintiff opposed defendant's trademark application. (*Id.*) Although plaintiff opposed defendant's application in August 2010 (Pl.'s Mot. at 7), and defendant did not commence selling its product until

―――――――――――――――――
2008).

January 2011, defendant was not under any obligation to cease its production, marketing and sale of the grout additive just because someone had challenged its rights to use a trademark if defendant believed that it had a legitimate right to use it.

Thus, this *Polaroid* factor does not weigh in plaintiff's favor.

### g. Quality of Products

A senior user of a trademark "may sue to protect his reputation even where the infringer's goods are of top quality" because it is "not required to put its reputation in [the junior user's] hands, no matter how capable those hands may be." *Mobil Oil Corp*, 818 F.2d at 259-60 (internal citations and quotation marks omitted). Moreover, the quality of the products at issue may "create an even greater likelihood of confusion as to source inasmuch as consumers may expect products of similar quality to emanate from the same source." *U.S. Polo Ass'n, Inc.*, 2011 WL 1842980, at *17. Thus, the Second Circuit has noted that its prior precedent has suggested that "when goods or services of equal quality compete, the quality factor 'cuts both ways.'" *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97, 118 (2d Cir. 2009) (*quoting Morningside Group Ltd. v. Morningside Cap. Group, LLC*, 182 F.3d 133, 142 (2d Cir. 1999).

The Court concludes that the products are of similar quality. Although plaintiff argues that defendant's product is inferior (and tarnishing plaintiff's reputation), defendant has set forth evidence, which the Court finds credible, that it has sold more than 50,000 gallons of its grout shield product, with its 20-year warranty, and has received no complaints on its product from Home Depot, which accounts for 95 percent of its sales. (A. Salvo Decl. ¶ 26; Tr. Sept.

12 at 111:23-117:18.) With respect to complaints to the defendant directly from customers, defendant was aware of approximately five complaints about its grout additive. (Tr. Sept. 12 at 112:15-21, 116:23-25.)

Plaintiff proffered evidence from three customers who contacted plaintiff after purchasing and using defendant's product because of a haze that developed over their grout. Plaintiff also points to several complaints on a blog indicating that defendant's grout additive was leaving a white haze on grout. (*Id*. at 73:17-25, 74-75; Pl.'s Ex. 9.) However, the Court found to be credible the testimony from Albert Salvo, in light of the lack of widespread complaints, that such complaints are problems with the application of the product, rather than the quality of the product itself. Thus, based upon the current record, the Court concludes the products are of similar quality and plaintiff's position on this factor is unpersuasive. Moreover, even if the similarity of the quality of the product favored confusion for the reasons articulated by the case authority cited above, the Court concludes that it is only one factor and, when balanced against all of the other factors discussed herein, is insufficient to support a likelihood of confusion.

### h. Sophistication of Buyers

"Generally, the more sophisticated and careful the average consumer of a product is, the less likely it is that similarities in trade dress or trade marks will result in confusion concerning the source of sponsorship of the product." *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1046 (2d Cir. 1992). This factor weighs in plaintiff's favor. Though defendant sells directly to distributors, like Home Depot, those distributors resell the product to the

average consumers seeking to renovate grout on their own. (Tr. Sept. 12 at 102:19-21.) Plaintiff largely sells its products directly to the same kinds of consumers who want to do some low-cost renovations on their property. (Tr. Sept. 9 at 40:4-6.) The Court concludes that the buyers of the parties' products are unsophisticated, and therefore more likely to get confused over similar uses of the Grout Shield mark by the parties. Thus, this *Polaroid* factor weighs in plaintiff's favor.

\* \* \*

In sum, most of the *Polaroid* factors—including, *inter alia*, the lack of strength of the trademark, the lack of proximity of the products, lack of significant evidence of actual consumer confusion, and the lack of bad faith on the part of defendant—strongly support defendant's position that there is no likelihood of confusion. Balancing all of the factors, the Court concludes that plaintiff has failed to present sufficient evidence under the *Polaroid* framework at this stage of the litigation to demonstrate a likelihood of success on the merits on the issue of likelihood of confusion.[28]

### D. Balance of Hardships

Finally, even if plaintiff can demonstrate sufficiently serious questions going to the merits of plaintiff's claims to make them a fair ground for litigation, plaintiff has failed to demonstrate that the balance of hardships weigh decidedly in plaintiff's favor. *See, e.g., Estee Lauder Cos., Inc. v. Batra*, 430 F. Supp. 2d 158, 182 (S.D.N.Y. 2006).

As an initial matter, plaintiff has indicated that its sales have not been affected since defendant's product entered the market in January 2011. Moreover, the Court credits the testimony at the hearing that requiring defendant to re-brand its grout additive could substantially harm defendant's relationship with Home Depot (Tr. Sept. 12 at 118:3-11, 125:17-126:7). Considering the amount of money invested in that relationship, and in producing defendant's bottles and labels, the Court concludes that the balance of hardships does not tip decidedly in plaintiff's favor especially where, as here, plaintiff has failed to demonstrate a concrete, actual injury in terms of reduction in sales.

---

[28] The Court need not address defendant's alternate arguments that plaintiff is barred by laches and the *Tea Rose-Rectanus* doctrine from seeking a preliminary injunction. (Def.'s Opp. at 15, 23.) Plaintiff's motion is denied for the reasons stated *supra*.

IV. Conclusion

For the foregoing reasons, plaintiff's application for a preliminary injunction is denied.

SO ORDERED.

_____
Judge Joseph F. Bianco
United States District Judge

Date:    November 16, 2011
         Central Islip, NY

         *       *       *

Plaintiff is represented by Harold G. Furlow, Esq., 260 West Main Street, Suite 10, Bay Shore, N.Y. 11706. Defendant is represented by Marshall Beil, Esq., McGuireWoods LLP, 1345 Avenue of the Americas, 7th Floor, New York, N.Y. 10105.